**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | | |
|---|---|---|
| John Parks Simpson and Freda Simpson, wife, | ) ) ) | |
| Plaintiffs, | ) ) ) | **MEMORANDUM OF LAW IN** |
| v. | ) ) | **SUPPORT OF DEFENDANT PORTER WARNER INDUSTRIES, L.L.C.'S** |
| Air Liquide America, LP, Celite Corporation, Mine Safety Appliances Company, Porter Warner Industries, LLC, Wesco Refractories, Inc., and John Doe 1-5, | ) ) ) ) ) | **MOTION FOR SUMMARY JUDGMENT**<br><br>C.A. No. 3:09-cv-172-FDW-DSC |
| Defendants. | ) ) | |

This action is before the court on the motion of Porter Warner Industries, LLC ("Porter Warner") for summary judgment as to Plaintiffs' complaint pursuant to Rule 56, FRCP. This motion is made upon the grounds that Plaintiffs failed to file this action in the U.S. District Court for the Western District of North Carolina within the three-year statute of limitations applicable to all of Plaintiffs' claims. Plaintiffs also failed to file this action in North Carolina within the six-year products liability statute of repose, which was in effect at the time Plaintiffs' claims accrued. It is further based on the grounds that there is no evidence to establish that Plaintiff John Parks Simpson was exposed to any silica-containing products distributed by Porter Warner or that any silica-containing products distributed by Porter Warner were a cause of Plaintiffs' alleged injuries and damages. In the alternative, Porter Warner would seek partial summary judgment herein as to Plaintiffs' claim of fraudulent concealment and representation on the grounds that such claims, which were not previously alleged in Plaintiffs' first two actions against Porter Warner, may not be properly made for the first time in a recommenced complaint involving the same parties after the original statute of limitations has expired. This

Memorandum of Law is submitted in support of Porter Warner's Motion for Summary Judgment.

## FACTS

Plaintiff John Parks Simpson ("Simpson") brings this action alleging that he sustained injuries as a result of significant exposure to silica that was mined, processed, manufactured, sold, installed, assembled and/or distributed by the defendants herein. Simpson's alleged exposure to silica occurred during the time that he worked at Charlotte Pipe & Foundry, a very large facility located in Charlotte, NC. At the time Simpson was hired in 1959, the plant covered approximately 10 to 15 acres and employed approximately 600 workers. (Deposition of John Parks Simpson ("Simpson Depo.") p. 35, line 6 – p. 36, line 2, pertinent portions of which are attached hereto as Exhibit A.) With the exception of a couple of years, Simpson worked at the plant from January 1, 1959, until he retired on August 31, 1998.

When Plaintiff was first hired at Charlotte Pipe & Foundry in 1959, he worked as a molder in the "old shop." (Simpson Depo., p. 35, lines 2-11.) As a molder, Plaintiff would shovel sand from a pile into a mold, which would be used in the production of iron castings. He also had to complete the additional steps necessary to pack the sand into the mold, insert a core to form a pattern, and pour metal into the mold. (Simpson Depo., p. 40, line 9 – p. 41, line 3; p. 46, line 16 – p. 47, line 6.) Although Plaintiff did not know the type of sand that the plant was using during that time, he believed that it originated out of Lugoff, SC. (Simpson Depo., p. 42, lines 11-20.) After approximately ten months on the job, Simpson left for other employment for a brief period of time, returning to work for Charlotte Pipe & Foundry as a molder in the old shop in late 1960. Less than one year after returning, Simpson transferred to the larger "new shop." (Simpson Depo., p. 50, lines 1-16; p. 52, lines 6-9.) He continued to perform the same

Case 3:09-cv-00172-FDW-DSC   Document 72-1   Filed 08/16/10   Page 2 of 27

basic job tasks for the duration of time that he worked as a molder until December 1963, except that in the new shop, the sand was transported and filled into the molds by use of an overhead hopper rather than a shovel. (Simpson Depo., p. 50, line 17 – p. 51, line 17; p. 52, lines 20-24.) Simpson would pull a lever to cause the sand to drop from the hopper into the mold. (Simpson Depo., p. 52, lines 20-24.) During that time, the sand used in the new shop was being mulled with Western or Southern Bentonite, a clay binding agent, and/or seacoal, an additive used to smooth the casting surface. (Simpson Depo., p. 49, lines 10-16; p. 55, line 6 – p. 56, lines 22.) Simpson did not know the origin of the sand that was being used during that time or how it arrived at the Foundry. (Simpson Depo., p. 56, line 23 – p. 57, line 7.)

Simpson was next transferred back to the old shop where he worked as an operator on ten-foot pipe machines. (Simpson Depo., p. 60, lines 10-14.) Simpson remained in that position from approximately 1966 to 1989, with the exception of approximately one year from June 1974 to June 1975, during which time he worked as a mixer, and a couple of years between 1976 and 1978, when he worked as a "relief man." (Simpson Depo., p. 83, line 2 – p. 84, line 2.) As a pipe machine operator, Simpson used a device called a lance to spray a slurry mixture, made of sand, water and soap, into ten-foot long steel flasks. After iron was poured into the flask to form a pipe and the finished pipe was removed, Simpson would manipulate a lever that would blow the dust out of the flask to prepare the flask to be re-used. (Simpson Depo., p. 70, line 24 – p. 73, line 21.) Simpson's duties also included changing out the flasks to make different sized pipes and performing general maintenance activities on Friday afternoons, which included cleaning the work areas and checking and maintaining equipment. (Simpson Depo., p. 78, line 12 – p. 80, line 21.) Simpson could not identify the origin of the material he used in the machines while working as a machine operator between 1966 and 1989, nor could he recall the

3

manufacturer, trade or brand name of any of the material. He remembered only that the material was originally transported to the plant in boxcars and that, because of the extent to which the materials were being damaged in transport, the plant later began to receive the materials by truck. (Simpson Depo., p. 80, line 22 – p. 82, line 20.)

In terms of Simpson's other positions in this time frame, during the one year that Simpson worked as a mixer in the mid-1970s, Simpson's duties involved making the slurry that was used by pipe machine operators by pouring 110-lb. bags of sand into the mixers, where it was mixed with water and soap by use of propellers. The material was then delivered for use by the machine operators. (Simpson Depo., p. 60 line 15 – p. 62, line 3; p. 69, line 19 – p. 70, line 19). As a relief man, Simpson would perform a variety of jobs, including working both as a pipe machine operator and mixer. He would relieve each of five employees one-by-one to allow each employee to take lunch and other breaks. (Simpson Depo., p. 83, line 13 – p. 84, line 5.)

Simpson suffered a heart attack in 1987, resulting in 5 ½ months out of work. Upon returning, Simpson worked for approximately one more year as a pipe machine operator before being transferred to a position in the supply room. As a supply room clerk, Simpson's duties included ordering, stocking and retrieving parts. He did not, however, have any responsibility for ordering any of the sand or binding agents used at Charlotte Pipe & Foundry. He remained in the supply room from 1989 until he retired on August 31, 1998. (Simpson Depo., p. 88, line 8 – p. 91, line 1.) As a supply room clerk, Simpson no longer worked directly with or around silica-containing products. Nonetheless, Simpson believes that he continued to receive some exposure to dust that emanated from the new shop into the upstairs portion of the supply room, where he would go to retrieve parts. (Simpson Depo., p. 91, lines 2-21.) In addition to retrieving parts as needed from the upstairs area of the supply room, Simpson also swept the upstairs approximately

4

one time per week, for about 15 to 20 minutes at a time, although he consistently wore a mask as respiratory protection when doing so. (Simpson Depo., p. 92, lines 18-25; p. 186, line 14-p. 187, line 22; p. 200, lines 3-6.) As before, Simpson did not know the brand or manufacturer's name of any of the sand that was used during that time, nor did he know how it was being delivered to the plant. (Simpson Depo., p. 93, line 25 – p. 95, line 14.) Simpson retired in August 1998.

At all times relevant to Simpson's working career at Charlotte Pipe & Foundry, Porter Warner, a company headquartered in Chattanooga, Tennessee, was a distributor of products including abrasive blasting and foundry operation products, used in foundries and related industries. (See Affidavit of Randy Smith ("Smith Aff."), ¶ 2, attached hereto as Exhibit B.) Whereas Porter Warner has distributed products containing silica, it has never been an originating source for any silica or silica-containing products. (Smith Aff. ¶ 2.)

Although Porter Warner has several offices and warehouses in multiple states in order to service its clients, it has never maintained an office or warehouse in the State of North Carolina. (Smith Aff. ¶ 9.) Additionally, until 1984, Porter Warner never distributed any products whatsoever to Charlotte Pipe & Foundry. (Smith Aff. ¶ 4.) Beginning in 1996, only about two years before Simpson retired from Charlotte Pipe & Foundry, Porter Warner made limited sales of resin coated sand and round grained silica sand to Charlotte Pipe & Foundry, which would have been used to make cores. (Smith Aff. ¶¶ 5, 7.) Any resin coated sand that would have been delivered by Porter Warner to Charlotte Pipe & Foundry would have been delivered from out-of-state by bulk railcars, *i.e.*, without any bags or packaging. (Smith Aff. ¶ 8.) The sales would have made up only a limited amount of the resin coated sand used at the facility during that time period, with additional sand having to be acquired from other sources. (Smith Aff. ¶ 10.)

5

By the time that Porter Warner first delivered any resin coated silica sand or round grained sand products to Charlotte Pipe & Foundry in 1996, Plaintiff had already long-before noticed a change in his lung function. In fact, Simpson testified that he began to experience a significant change in his breathing five years before he retired in 1998, to the point that he was unable to "really do anything." (Simpson Depo., p. 34, lines 11-17; p. 140, lines 9-21.) Simpson ultimately sought an evaluation of his lungs in early 2001, resulting in a diagnosis of silicosis on March 21, 2001, made by Dr. John E. Barkley. (See Plaintiffs' Answers to Defendants' Initial Joint Set of Interrogatories to Plaintiffs John Parks Simpson and Freda Simpson, Ans. to Int. no. 7, attached hereto as Exhibit C). According to Simpson, Dr. Barkley explained to him in March of 2001 that he had been diagnosed with silicosis, the source of silicosis, and the effects thereof, including that the condition was not treatable and that Simpson's breathing would just continue to worsen. (Simpson Depo., p. 138, line 22-p. 139, line 8; p. 140, line 22-p. 141, line 4; p. 143, line 25-p. 144, line 14). Plaintiff has remained under the care of a pulmonologist since his diagnosis with silicosis in March 2001. (Simpson Depo., p. 144, line 7-10, Exhibit A; Answer to Int. no. 7, Exhibit C).

Based on Plaintiff's diagnosis with silicosis, he first hired an attorney and filed a claim for benefits for occupational lung disease against his former employer, Charlotte Pipe & Foundry, with the North Carolina Industrial Commission on or about August 8, 2002. Plaintiff's Form 18B, completed for the filing of his workers' compensation claim, reflected a date of diagnosis of occupational disease caused by exposure to silica and other substances of March 22, 2001, made by Dr. John E. Barkley. (Simpson Depo., p. 146, line 19-p. 147, line 14.) During the pendency of Simpson's workers' compensation claim, Simpson was further diagnosed with stage I adenocarcinoma of the lung, made on June 11, 2003, after he underwent a right upper

6

lobectomy. The lobectomy was successful in removing all of the cancerous cells, after which Simpson entered remission and has remained free of lung cancer. (Simpson Depo, p. 146, lines 3-11.) Simpson added his diagnosis of adenocarcinoma to his workers' compensation claim for occupational lung disease, which eventually culminated in a settlement of Simpson's claims for both silicosis and adenocarcinoma. (Simpson Depo., p. 150, lines 16-22.) Plaintiffs entered into the final compromise settlement agreement on November 18, 2003, and later signed the settlement agreement and release on March 22, 2004.

After fully and finally resolving his workers' compensation case against Charlotte Pipe & Foundry in March 2004, Simpson did not file an initial complaint against Defendant Porter Warner, and multiple other defendants, until August 19, 2004, approximately five months later, and approximately three years and five months after Plaintiff's diagnosis with silicosis in March 2001. This date is also approximately 11 years after Simpson had first noticed a change in his breathing. Plaintiffs' initial complaint was filed in the Circuit Court of Kanawha County, West Virginia, alleging that Plaintiff was a foundry worker who contracted silicosis caused by exposure to breathable free silica (hereinafter "West Virginia Complaint," a copy of which is attached hereto as Exhibit D). The West Virginia Complaint named numerous defendants in addition to Porter Warner, including Mine Safety Appliances Company and Air Liquide America, LP, which were also named in the instant litigation. At that time, Plaintiffs' causes of action included (1) strict products liability, (2) misrepresentation, (3) negligence, (4) breach of warranty, (5) malice, (6) loss of consortium and (7) increased risk of wrongful death. Plaintiffs requested both actual and punitive damages. On or about October 4, 2004, multiple defendants filed motions to dismiss Plaintiffs' complaint based on West Virginia Code § 56-1-1(c) on the grounds that Plaintiffs' Complaint was filed in an improper venue. Because Plaintiffs were non-

residents of West Virginia and all or a substantial part of the acts or omissions giving rise to the claims asserted by Plaintiffs had not occurred in West Virginia, the court granted the motions to dismiss on February 4, 2005, dismissing the action without prejudice.

After the dismissal of his West Virginia Complaint, Plaintiff waited two and a half months before he filed his second complaint against Porter Warner on April 20, 2005, in the York County Court of Common Pleas, State of South Carolina (hereinafter "South Carolina Complaint," attached hereto as Exhibit E), alleging that he sustained personal injuries including "silicosis and other silica-related diseases and physical conditions" as a result of his alleged workplace exposure to silica. (South Carolina Complaint, ¶14). As in the West Virginia Complaint, Plaintiffs named Porter Warner. Plaintiff's causes of action against the defendants included (1) negligence, (2) breach of implied warranties of merchantability and fitness for a particular purpose, (3) misrepresentation or omission, and (4) strict liability. Plaintiff's complaint further included a claim for punitive damages. Pursuant to a Motion to Dismiss based on South Carolina's Door Closing Statute, S.C. Code Ann. § 15-5-150, the South Carolina court dismissed Simpson's Complaint as to all defendants without prejudice, by Order of Dismissal filed on November 1, 2006 (attached hereto as Exhibit F). As an out-of-state resident, Plaintiff lacked standing to bring an action in South Carolina courts for a cause of action arising outside of the State. The Order issued by the South Carolina court, as that issued in West Virginia, contained no tolling provisions.

On November 16, 2006, Plaintiff, together with his wife, Freda Simpson, filed yet a third complaint against Celite Corporation, Mine Safety Appliances Company, Air Liquide America, LP, and Porter Warner Industries, LLC in Harris County District Court, Texas (hereinafter "Texas Complaint," attached hereto as Exhibit G). The Texas Complaint also alleged that

Plaintiff John Parks Simpson developed "silica-related lung disease and other related physical conditions" as a direct and proximate result of the defendants' conduct. Plaintiffs' causes of action included (1) negligence, (2) strict liability, (3) false and fraudulent representations, omissions and concealment, and (4) malice. The case arising out of the Texas Complaint was then transferred to State Court Consolidated Litigation in Harris County, Texas. On June 1, 2009, Plaintiffs filed a Notice of Non-Suit, dismissing without prejudice all of their claims against all Defendants. Plaintiffs' Notice and Motion of Non-Suit was granted by Order of the Court, signed on June 11, 2009.

Prior to Plaintiffs' dismissal of their Texas litigation, Plaintiffs finally filed the Complaint at issue herein, their fourth, which they filed on April 22, 2009. As in the prior West Virginia, South Carolina and Texas complaints, Plaintiffs alleged that Simpson had developed silica- and dust-related lung diseases. Also, as before, Plaintiffs' causes of action against Defendants included (1) negligence, (2) strict liability, (3) breach of warranty, and (4) loss of consortium, together with a request for punitive damages. The Complaint further included the claim for fraudulent concealment and representation, which was made for the first time in Plaintiffs' Texas action, but had not been included in their West Virginia or South Carolina Complaints.

## STANDARD OF REVIEW

Summary judgment is proper and should be rendered if "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). In order to avoid summary judgment, the opposing party must provide sufficient evidence to allow a reasonable jury to find for him at trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

9

Indeed, "a party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. In considering a motion for summary judgment, while a court must consider the evidence in the light most favorable to the non-moving party, it may also weigh the competing arguments for their persuasiveness. See Matsushita, 475 U.S. at 587.

Summary judgment is designed to save valuable trial time and thus assist in securing speedy and inexpensive justice. As Judge Winter aptly concluded in Bland v. Norfolk and Southern Railroad Co., 406 F.2d 863 (4th Cir. 1969):

> While a day in court may be a constitutional necessity when there are disputed questions of fact, the function of a motion for summary judgment is to smoke out if there is any case, i.e., any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial by providing a speedy and efficient summary disposition.

Id. at 866.

## ARGUMENT

**I.** **Plaintiffs failed to file their action against Defendant Porter Warner for silicosis and other silica-related diseases within the applicable three-year statute of limitations, and therefore, Plaintiffs' claims herein must be dismissed.**

It is undisputable that Simpson first became aware of an injury that he attributed to silica exposure on March 22, 2001, at the latest, and that he did not file his first of four separate lawsuits arising from his alleged injuries until August 19, 2004, three years and five months later. Pursuant to North Carolina General Statute §1-52(16), an action for personal injury must be commenced within three years from the date on which the claimant became aware of the injury or on which the injury ought reasonably to have become apparent to the claimant,

10

whichever event occurs first. This three-year statute of limitation applies in product liability cases wherein the personal injury is based upon a product that allegedly causes a disease. See Gardner v. Asbestos Corp., 634 F.Supp. 609 (W.D.N.C. 1986). Specifically, the Gardner court found that the statute of limitations begins to run in these types of cases when the disease is diagnosed. Id. at 612. "Once the statute of limitations begins to run, it continues to run until appropriate judicial process is commenced." Clark v. Velsicol Chemical Corp., 431 S.E.2d 227, 228 (N.C. 1993).

Moreover, the Supreme Court of North Carolina has interpreted the statute of limitations in § 1-52(16) to mean that the statute begins to run when the plaintiff is aware that he has suffered damages, and it does not matter that "further damage could occur" or in fact does occur. See Pembee Mfg. Corp. v. Cape Fear Const. Co., Inc., 313 N.C. 488, 493, 329 S.E.2d 350, 354 (1985). Indeed, North Carolina law recognizes claims for future disease under certain circumstances or even "fear of" future disease. See, e.g., Alley v. Charlotte Pipe and Foundry Co., 159 N.C. 327, 74 S.E. 885 (1912). Therefore, the discovery of further damage or injury to a plaintiff "does not bring about a new cause of action, it merely aggravates the original injury." Pembee, 313 N.S. at 494, 329 S.E.2d at 354; see also Marshburn v. Associated Indemnity Corp., 84 N.C.App. 365, 353 S.E.2d 123 (1987). In Marshburn, the plaintiffs' home was struck by lightning in July 1979, which resulted in obvious damage to, among other things, the walls and brickwork. The plaintiffs reported the damage to defendant insurance company, which made full payment of the claimed damages. In September 1982, after the original three-year statute of limitations period had expired, the plaintiffs noticed further cracking along the mortar joints and brickwork and made a claim to the defendant for that damage. An engineer retained by the plaintiffs determined that the lightning strike had cracked a concrete footing under the house and

11

that "the full extent of the damage done had not become apparent until the building had a chance to settle," *i.e.*, that the full amount of the damage *had not even occurred* at that time of the lightning strike, and had only occurred after some time had passed. Subsequently, the plaintiffs brought an action against the defendant under their homeowners policy for the later-occurring and later-discovered damages caused by the lightning strike.

After the trial court granted summary judgment to the defendant, the Court of Appeals examined whether the plaintiffs' claim was timely filed under the three-year statute of limitations period in N.C.G.S. § 1-52(16). The Court, citing Pembee, first noted that the discovery rule delays the running of the limitations period until the plaintiff is aware that he has suffered damage, but "*not until he is aware of the full extent of the damages suffered*." Marshburn, 84 N.C.App. at 373, 353 S.E.2d at 128 (emphasis in original). The Court stated further that once the "physical damage has been discovered, the injury springs into existence and completes the cause of action." Id. Applying these concepts to the facts in Marshburn, the Court determined that the lightning strike produced "immediate and obvious damage" to the house and "made it apparent to plaintiffs that their home had been damaged." Id. Thus, the limitations period began running when the lightning strike occurred in 1979 and did not re-start with the discovery of additional damages in 1982. As in Pembee, the Marshburn Court held that the fact that the plaintiffs could not have discovered further damage or injuries prior to the running of the statute of limitations was irrelevant:

> The immediate and obvious damage to the structure . . . made it apparent to plaintiffs that their home had been damaged, and their cause of action against defendants accrued at that time. *The fact that evidence of latent damages was discovered more than three years later does not restart the statutory limitations period*.

Id. at 374, 353 S.E.2d at 128 (emphasis added). Because three years had passed since the original damage was discovered, the plaintiffs' claims for later damage were time-barred. Id.

Through Pembee and Marshburn, North Carolina courts have made it clear that the discovery of the initial injury or damage is the operative point when the limitations period begins to run, and the limitations period does not "re-start" upon the discovery of a latent injury. Both cases put the burden on the plaintiff to determine the extent of his present and future injuries, and seek compensation for those injuries in one lawsuit filed within three years of the discovery of the injury. Accordingly, the key date in this instance for purposes of analyzing the statute of limitations is the *first* date on which Simpson knew or should have known that he had sustained *any* injury due to exposure to silica and silica-related products, which, as will be addressed in detail below, was no later than March 22, 2001.

Until discovery commenced in the instant litigation, the information provided to the Defendants erroneously indicated that Simpson had not been diagnosed with silicosis and silica-related lung diseases until mid-2002 or 2003. Indeed, in Plaintiffs' South Carolina Complaint, he alleged that he "received a radiological report that was consistent with, but not diagnostic of, silicosis on July 12, 2002" and that "Plaintiff was later diagnosed with silicosis on November 17, 2003." (South Carolina Complaint, ¶ 5). Despite these earlier allegations, both Plaintiffs' discovery responses and Simpson's deposition testimony in the present action confirm that Simpson was actually aware of his diagnosis with silicosis and silica-related lung disease on or about March 21st or 22nd, 2001, pursuant to a biopsy performed on March 21, 2001, by Dr. John E. Barkley.[1] That Simpson was aware of both his diagnosis with silicosis on that date, and that it was related to his occupational exposure to silica while working at Charlotte Pipe & Foundry, is

---

[1] Plaintiffs did not provide a date of diagnosis in the West Virginia litigation. Accordingly Plaintiffs' allegations in the South Carolina Complaint were the first representations to Defendants of when Plaintiffs' diagnoses were made.

13

further evidenced by Simpson's filing of a claim for benefits on August 8, 2002, with the North Carolina Industrial Commission arising from that diagnosis. Plaintiffs' claim for benefits therein reflected the correct date of diagnosis of March 22, 2001. By previously and inexplicably claiming that he had received a radiological report consistent with silicosis on July 12, 2002, followed by formal diagnosis on November 17, 2003, a date that is *15 months after* Simpson had already filed his workers' compensation claim for silicosis, Simpson successfully evaded any earlier motions for summary judgment based on the statute of limitations in his prior actions.

After resolving his worker's compensation claim against Charlotte Pipe & Foundry, Simpson waited several months before filing his first action against the Defendants in West Virginia. Plaintiffs' West Virginia Complaint was not filed until August 19, 2004, a full three years and five months after his diagnosis of silicosis and silica-related lung disease, and over ten years after Plaintiff first noticed his increasing breathing difficulties. With Simpson's development of increasing breathing difficulties up to five years before he retired in 1998, culminating in a diagnosis of silicosis and silica-related lung disease made by biopsy on March 22, 2001, a straight-forward application of N.C.G.S. § 1-52(16) demonstrates that Plaintiffs' claims are clearly time-barred. Under North Carolina law, Simpson's alleged injury "sprung into existence" no later than March 22, 2001, and completed the cause of action at that time. Whether Simpson later developed additional silica-related diseases or conditions after his initial diagnosis is irrelevant. In fact, Simpson contemplated and expected, when told of his diagnosis with silicosis in March 2001, that his silica-related conditions were untreatable and would only continue to worsen. (Simpson Depo., p. 139, lines 1-8; p. 143, line 25-p. 144, line 14.) In light of the foregoing, there is no other conclusion but that Plaintiffs failed to file their action against Porter Warner within three years of discovering that Simpson had allegedly sustained injuries

and damages that he attributes to exposure to silica-containing products and that, therefore, Plaintiffs' claims herein should be dismissed in their entirety.

## II.   Plaintiffs' claims are also barred by North Carolina's statute of repose.

Even if Plaintiffs' claims are somehow not barred by the statute of limitations, they are nonetheless barred by the North Carolina products liability statute of repose, formerly found in N.C. Gen Stat. § 1-50(a)(6), which was in effect at the time Plaintiffs' causes of action accrued.[2] The products liability statute of repose provided:

> *No action* for the recovery of damages for personal injury, death or damage to property based upon or arising out of any alleged defect or any failure in relation to a product shall be brought more than six years after the date of initial purchase for use or consumption.

N.C. Gen Stat. § 1-50(a)(6) (emphasis added.).  This statute was denominated as a "statute of repose" because if six years elapse from a product's initial purchase for use or consumption, any cause of action asserted after that interval will be barred.  See Bondreau v. Baughman, 322 N.C. 331, 340, 368 S.E.2d 849, 856 (1988) (*citing* Bolick v. American Barmag Corp., 306 N.C. 364, 366, 293 S.E.2d 415, 417 (1982)).  Consequently, this statute "serves as an unyielding and absolute barrier that prevents a plaintiff's right of action even before his cause of action may accrue."  Id. (*quoting* Black v. Littlejohn, 312 N.C. 626, 633, 325 S.E.2d 469, 475 (1985)).  Indeed, "a statute of repose may operate to cut off a defendant's liability even before an injury occurs."  Nolan v. Paramount Homes, 135 N.C. App. 73, 77, 518 S.E.2d 789 (1999).

As noted above, the statute of repose imposes a condition precedent on a plaintiff.  If a plaintiff does not file a claim within six years of a product's initial purchase, the plaintiff literally

---

[2] N.C. Gen Stat. § 1-50(a)(6) has since been repealed, and the section has been recodified under N.C. Gen. Stat. § 1-46.1, with the only change therein being to extend the statute of repose from six to twelve years.  The act became effective on October 1, 2009, and applies to causes of action that accrue on or after that date.  As expressly set forth

has no cause of action.  As succinctly explained in <u>Jack H. Winslow Farms, Inc. v. Dedmon</u>, 171

N.C.App. 754, 615 S.E.2d 41 (2005):

> "Ordinary statutes of limitation are clearly procedural, affecting only the remedy directly and not the right to recover. . . .  The statute of repose, on the other hand, acts as a condition precedent to the action itself. . . .  Unlike a limitation provision which merely makes a claim unenforceable, a condition precedent establishes a time period in which suit must be brought in order for the cause of action to be recognized.  If the action is not brought within the specified period, the plaintiff literally has no cause of action.  The harm that has been done in *damnum absque injuria* – a wrong for which the law affords no redress."

<u>Winslow Farms</u>, 171 N.C.App. at 757, 615 S.E.2d at 44 (quoting <u>Bondreau</u>, 322 N.C. at 340-41,

368 S.E.2d at 857 (emphasis in original.)  Therefore, the products liability statute of repose is not

concerned with when an injury occurs or accrues, or even if the injury is latent or not, but rather

it looks at the passage of time from when the product was sold.

Moreover, as recognized by North Carolina appellate courts, the products liability statute

of repose provides protection to product manufacturers and sellers from stale claims.  As so ably

explained in the <u>Tetterton</u> case:

> The statute of repose was enacted as a part of the products liability act, which was the legislature's "response to the upheaval in product liability law of the 1970's."  The number of suits being brought against manufacturers was increasing during this period of time and the legislature sought to curtail such suits and to limit the manufacturers' liability by enacting product liability reform statutes.

> Proponents of statutes of repose contend that the most significant problem for industry in product liability actions is the long 'tail' or period of potential liability, facing manufacturers and sellers of products.  Permitting a person to bring a product liability action within an indefinite period of time after the product reaches the stream of commerce subjects the *seller or manufacturer* to potential liability for an unlimited time after *his* contact with the product has ended.  Manufacturers favor statutes of repose because they eliminate the 'tail' problems of older products.  Thus, the obvious intent of the legislature . . . was to limit . . . the manufacturer's [] liability after a certain period of years had elapsed from the date of initial purchase for use or consumption.

---

by the N.C. Legislature, nothing in the act was intended to change existing law relating to product liability actions based upon disease.

<u>Tetterton v. Long Manufacturing Co.</u>, 314 N.C. 44, 55-56, 332 S.E.2d 67, 73-74 (1985) (citations omitted; emphasis in original). An advantage of the statute of repose is that it establishes "an actuarially certain date after which no liability can be assessed." <u>Id.</u> at 54, 332 S.E.2d at 73. Moreover, the products liability statute of repose "is intended to be a substantive definition of rights which sets a fixed limit after the time of the product's manufacture beyond which the seller will not be held liable." <u>Davidson v. Volkswagenwerk, A.G.</u>, 78 N.C. App. 193, 195, 336 S.E.2d 714, 716 (1985).

No disease exception[3] has been carved out by North Carolina appellate courts, which would have the effect of fatally thwarting the purpose of the statute, resulting in product manufacturers facing perpetual liability. Silica litigation presents a good example of a potential perpetual liability for defendants. It is not uncommon for plaintiffs to claim injury due to exposure to silica-containing products more than 50 years ago. In the instant case, Simpson asserted that he was exposed to silica beginning in 1959, just over 50 years ago. With such great passage of time, pertinent and helpful documents for defendants no longer exist or can be found, and memories of plaintiffs and co-workers, who testify about alleged exposure, are highly suspect. Statutes of repose, like N.C. Gen. Stat. § 1-50(6), were designed to prevent such situations. Here, because Simpson last worked at Charlotte Pipe & Foundry in August 1998 and, therefore, could have only been exposed, if at all, to any silica sand products distributed by Porter Warner prior to that time, and because he did not file the instant action herein until April 22, 2009, over ten years later, Plaintiffs' claims are barred by the plain language of N.C. Gen. Stat. § 1-50(6) and should be dismissed.

---

[3] Defendant anticipates that Plaintiffs will argue that an exception to the products liability statute of repose was judicially predicted for latent disease claims, commonly referred to as the "disease exception." However, that position discounts the very definition and purpose of a statute of repose, disregards well-documented legislative intent and history behind North Carolina's statute of repose, and ignores a body of case law holding that the words

17

**III.    Plaintiffs cannot prove that Simpson was exposed to silica or any silica-containing products distributed by Porter Warner Industries, LLC, and therefore that Porter Warner caused any of Plaintiffs' alleged injuries and damages.**

**A.    Because Simpson has failed to establish exposure to a specific silica-containing product distributed by Porter Warner on a regular basis over an extended period of time, in proximity to where Simpson actually worked, he cannot establish that such exposure, if any, was a cause of Plaintiffs' alleged injuries and damages.**

In order for Porter Warner to be held liable for any injuries sustained by Simpson, "[the] plaintiff's evidence must demonstrate that he was actually exposed to the alleged offending products. It will not be enough for plaintiff simply to show that various products were shipped to various job sites on which he worked." Wilder v. Amatex Corp., 314 N.C. 550, 553-54, 336 S.E.2d 66, 68 (1985). More fully developed law pertaining to asbestos-related personal injury cases is instructive in the instant case to establish the standard that Plaintiffs must meet to prove liability on the part of Porter Warner for Simpson's alleged silica-related diseases, as diseases caused by exposure to both silica and asbestos develop over long periods of time after multiple exposures to offending products. See id. at 557 (noting that occupational diseases, including asbestosis, silicosis and chronic obstructive lung disease all present intrinsically different kinds of claims from traditional occupational injuries in that they are all the result of prolonged exposure to hazardous conditions or disease-causing agents). Indeed, the North Carolina Workers' Compensation Act treats both asbestosis and silicosis as occupational diseases within the same vein. See N.C.G.S.A. §97-53.

According to the Fourth Circuit, plaintiffs in asbestos-related personal injury cases "must prove more than a casual or minimum contact with the product containing asbestos in order to hold the manufacturer of that product liable." Jones v. Owens-Corning Fiberglas Corp., 69 F.3d

of the statute of repose are clear, unequivocal, and not amenable to exceptions. Accordingly, the statute should be

18

712, 716 (1995) (quoting <u>Lohrmann v. Pittsburgh Corning Corp.</u>, 782 F.2d 1156, 1162 (4th Cir. 1986)). "Instead, the plaintiff must present evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." <u>Id.</u> (quoting <u>Lohrmann</u>, 782 F.2d at 1162-63). Thus, the above-captioned lawsuit cannot go to a jury without evidence that Simpson was not only in the vicinity of a silica-containing product distributed to his workplace by Porter Warner, but also that he worked with or around such materials on a regular basis over an extended period of time. Without such evidence, there is no reasonable basis upon which the jury can infer that Simpson inhaled or otherwise ingested silica or silica dust from a product distributed by Porter Warner and, thus, summary judgment is appropriate.

Here, Simpson's belief that silica and/or silica-containing products were delivered to Charlotte Pipe & Foundry by defendant Porter Warner during the time that Simpson was employed at the facility is based *solely* on his understanding of what he was allegedly told by co-worker Charles Hefner a couple of years ago, and on *no other basis*. (Simpson Depo., p. 63, lines 1-17; p. 64, lines 1-6; p. 128, line 25-p. 129, line 6; p. 209, line 5-9 ). A full examination of Simpson's testimony regarding Porter Warner reveals that Simpson has provided nothing more than wholly self-serving testimony that he "always heard" of Porter Warner at Charlotte Pipe & Foundry (Simpson Depo., p. 203, lines 2-12), which is not probative of the issue of Simpson's exposure to and development of silica-related lung diseases caused by any acts or omissions on the part of Porter Warner. When probed more deeply for any information or actual *personal knowledge* held by Simpson regarding silica-containing products that Porter Warner allegedly provided to Charlotte Pipe & Foundry, Plaintiff admitted that he did not know where any Porter Warner warehouse, as described to him by Mr. Hefner, was located, never saw any Porter

---

enforced *as written*.                              19

Warner trucks, never knew any Porter Warner employees or representatives, did not know over what period of time Porter Warner may have delivered materials, never saw any invoices or bags of material bearing Porter Warner's name, and lastly admitted that he did not really know the nature of Porter Warner's business. (Simpson Depo., p. 63, line 1-p. 65, line 9; p. 87, lines 9-16; p. 128, line 25-p. 129, line 9; p. 206, line 3-p. 209, line 9). Simpson ultimately admitted that, other than Mr. Hefner telling him that Porter Warner had delivered materials to Charlotte Pipe & Foundry, he had no other basis for his belief that Porter Warner was the source of any silica or silica-containing products used anywhere at the plant. (Simpson Depo., p. 63, lines 1-17; p. 64, lines 1-6; p. 128, line 25-p. 129, line 6; p. 209, line 5-9 ).

Accordingly, Plaintiff has failed to provide any probative evidence of exposure to a specific product containing silica distributed by Porter Warner, much less exposure to any such product(s) on a regular basis over an extended period of time in proximity to where Plaintiff worked, as required by the Fourth Circuit in <u>Lohrmann</u>. As such, Plaintiffs have failed to establish that there is a "genuine issue as to any material fact," and Porter Warner is entitled to summary judgment as to all claims. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

> **B.** **Because the evidence establishes that Plaintiff's only exposure to resin coated silica sand and/or round grained silica sand distributed by Porter Warner could not have occurred prior to 1996, Simpson's alleged development of silicosis and/or other silica-related diseases could not have been caused by any such products.**

Chronic silicosis and silica-related diseases, like asbestos-related diseases, do not develop immediately upon exposure. Rather, "[a]n employee does not contract or develop asbestosis or silicosis in a few weeks or months. These diseases develop as the result of exposure for many years to asbestos dust or dust of silica. Both diseases, according to the textbook writers, are

20

incurable and usually result in total permanent disability." Pope v. Johns Manville, 2010 WL

157508, 11 (N.C.App., 2010) (quoting Honeycutt v. Carolina Asbestos Co., 70 S.E.2d 426, 430

(N.C., 1952)). See also Payne v. Charlotte Heating & Air Conditioning, 616 S.E.2d 356, 361

(N.C.App. 2005) (referring to silicosis as a latent occupational disease). See also In re Silica

Products Liability Litigation, 398 F.Supp.2d 563, 589, 623 (S.D. Tex., 2005) (noting that the

time between exposure and the onset of disease to ensure consistency with the latency period

typical of silicosis is an important consideration in diagnosing the disease).

Traditionally, interstitial lung disease following exposures to silica is defined

pathologically. If lung tissue is not available for analysis, the diagnosis can then be determined

by meeting three criteria: (1) evidence of structural pathology consistent with silica-related

disease as documented by chest x-ray or CT scan, (2) evidence of causation by silica as

documented by the occupational and environmental history, and (3) exclusion of alternative

plausible causes for the findings. Courts in other jurisdictions have expressly recognized these

criteria as being diagnostic of silicosis. As set forth by the U.S. District Court for the Southern

District of Texas, "[a] diagnosis [of silicosis] requires (1) an adequate exposure to silica dust

*with an appropriate latency period*, (2) radiographic evidence of silicosis, and (3) the absence of

any good reason to believe that the radiographic findings are the result of some other condition

(i.e., a differential diagnosis)…. [T]hese three criteria are universally accepted, as demonstrated

by learned treatises and experts in the field." In re Silica Products Liability Litigation, 398

F.Supp.2d 563, 622 (S.D. Tex., 2005) (emphasis added). Alternatively, a biopsy that can

identify the presence of silica particles within the lung tissue, as was done in Simpson's case

herein, can also be diagnostic. See id., n.99.

Under the circumstances at issue in this case, the latency period, or time span between the injurious exposure to silica and the onset of disease, is key in determining whether any acts or omissions on the part of Porter Warner could have caused or contributed to Simpson's alleged diagnoses of silicosis and lung cancer. Silicosis is typically characterized by a lengthy latency period, and consequently, a lengthy temporal separation between the alleged tortious conduct and the appearance of injury. See Wilder v. Amatex Corp., 314 N.C. 550, 557, 336 S.E.2d 66, 70 - 71 (N.C. 1985) (noting that diseases including silicosis normally develop over long periods of time after multiple exposures to offending substances which are thought to be causative agents and that one or even multiple exposures to an offending substance may not constitute an injury); See also Southern Silica of Louisiana, Inc. v. Louisiana Ins. Guar. Ass'n, 979 So.2d 460, 465, 2007-1680 (La., 2008); Liberty Mut. Ins. Co. v. Lone State Industries, Inc., 2007 WL 447957 (Conn.Super., Jan. 25, 2007) (No. X02CV044001208S), aff'd in part and rev'd in part on unrelated grounds by Liberty Mut. Ins. Co. v. Lone State Industries, Inc., 290 Conn. 767, 967 A.2d 1 (Conn. Mar 24, 2009)); State ex rel. Reliance Elec. Co. v. Wright, 92 Ohio St.3d 109, 111-112, 748 N.E.2d 1105, 1108 (Ohio 2001) (noting that Ohio courts have held that silicosis has a very long latency period). In fact, latency periods that are generally recognized and referenced by experts for both plaintiffs and defendants in silica litigation have ranged from a minimum of 10 years to upwards of 30 years. See, e.g., In re Silica Products Liability Litigation, 398 F.Supp.2d at 569 ("Chronic or classic silicosis, the most common form, typically requires at least 15-20 years of moderate to low exposure of respirable silica."); Headley v. Ferro Corp., 630 F.Supp.2d 1261 (W.D. Wash. 2008) (plaintiff's expert, Dr. Dorsette Smith, indicated that there was a 20-year latency period for silicosis; plaintiff's expert, Dr. Samuel P. Hammar noted that the latency period generally stretches from 15 to 30 years); Miller v. Lehman-Roberts Company,

2007 WL 2833490, at *2 (Oct. 1, 2007) (Dr. Arthur Frank, an occupational medicine specialist who has studied and written extensively on pulmonary fibrosis, opined that there is a minimum of 10 years after exposure before resulting silicosis becomes apparent, and the latency period can be much long, up to 30 or more years).

Because of the long latency periods involved in either the diagnosis of silicosis and/or the diagnosis of lung cancer, both disease processes had to have already been initiated well before 1996, which was the first time that Porter Warner ever made any resin coated silica sand and round grained silica sand sales to Simpson's workplace. Moreover, Simpson testified that he had first noticed symptoms of significant shortness of breath to the point where he was unable to do anything approximately five years before he retired. (Simpson Depo., p. 140, lines 9-21). As such, Simpson began to notice symptoms of his disease processes in or around August 1993, *three years before* Porter Warner made resin coated silica sand and round grained silica sand sales to Charlotte Pipe & Foundry. Not only had Simpson's disease processes already developed by the time that Porter Warner supplied any resin coated silica sand and round grained silica sand products whatsoever to Charlotte Pipe & Foundry, but Simpson was also at that time no longer working with or around any silica or silica-containing products. Rather, he was working in an air conditioned supply room as a supply clerk, where he was tasked with maintaining the inventory and retrieving parts as requested. Although he described the upstairs of the supply room as dusty, Simpson consistently wore a paper mask on every occasion that he swept the area and thereby disturbed the dust, which he believed emanated from the new shop.

As any exposure that Simpson even potentially had to resin coated silica sand and round grained silica sand products distributed to CP&F by Porter Warner could have occurred only at the very end of Simpson's career, if at all, such exposures were insufficient as a matter of law to

23

have caused or contributed to Plaintiff's alleged diagnosis of silicosis or lung cancer. As such, Porter Warner is entitled to summary judgment as to all of Plaintiffs' claims herein.

**IV.  In the alternative, Porter Warner is entitled to summary judgment as to Plaintiffs' claim of fraudulent concealment and representation as that claim was only raised for the first time in Plaintiffs' third complaint, filed after the original statute of limitations had expired.**

If by some finesse of reasoning, Plaintiffs' claims against Porter Warner are not dismissed in their entirety based on either the statue of limitations or lack of exposure and causation, Porter Warner, at the very minimum, is entitled to summary judgment as to Plaintiffs' claim for fraudulent concealment and representation. Although Plaintiffs' first two actions, filed in West Virginia and South Carolina, included claims of negligence, strict liability, breach of warranty, and misrepresentation, those actions did not include a claim for fraudulent concealment or representation, which was only raised for the first time in Plaintiffs' Texas and North Carolina actions. Accordingly, even if Plaintiffs first action was timely, which Porter Warner strongly disputes, and the North Carolina savings clause has somehow managed to preserve Plaintiffs' claims against Porter Warner, Plaintiffs' claim for fraudulent concealment or representation may not be made for the first time in Plaintiffs' recommenced Complaints in Texas or North Carolina as the statute of limitations on that claim has long expired and that claim can, in no way, be construed as a continuation of the first two actions, nor derivative of the first actions.

Under North Carolina law, both Plaintiffs' claims for personal injury and for fraud are governed by a three-year statute of limitations set forth in N.C. Gen. Stat. §1-52(16) and §1-52(9), respectively. Whereas pursuant to North Carolina Rule 41, a plaintiff (or a judge) may dismiss a plaintiff's action, without prejudice, at any time before a plaintiff rests his case, and

24

that plaintiff may then recommence the action based on the same claim within one year of dismissal, the rule may not be used to manipulate the statute of limitations of claims that were already time-barred.  See Staley v. Lingerfelt, 134 N.C.App. 294, 298, 517 S.E.2d 392, 395 (1999).  Moreover, if a plaintiff chooses to recommence a case after taking a Rule 41 dismissal, the new action must be based upon the *same claim* as the previous action.  See Brannock v. Brannock, 135 N.C.App. 635, 639-40, 523 S.E.2d 110, 113 (1999).  See also Cherokee Ins. Co. v. R/I, Inc., 97 N.C.App. 295, 297, 388 S.E.2d 239, 240 (1990) (providing that both claims must be "substantially the same, involving the same parties, the same cause of action, and the same right").  If, on the other hand, the actions are "fundamentally different," then the new action is not considered a continuation of the first action, and Rule 41 should not be invoked.  See Stanford v. Owens, 76 N.C.App. 284, 289, 332 S.E.2d 730, 733 (1985).

North Carolina courts have interpreted Rule 41 to apply to claims that are added to a recommenced complaint only in limited circumstances.  That includes claims for punitive damages and for loss of consortium, the latter of which would be derivative.  See Strawbridge v. Sugar Mountain Resort, Inc., 243 F.Supp.2d 472 (W.D.N.C. 2003).  The extent to which Rule 41 allows new claims, however, is limited.  North Carolina courts have expressly held that a fraud claim, first filed during the one year savings period, but which would otherwise be untimely, will not be allowed to proceed when the original claim was for negligent misrepresentation.  See id.; Stanford, 76 N.C.App. at 288, 332 S.E.2d at 733.  Because fraud is its own cause of action and is "fundamentally different from a claim for negligence," it is not considered a continuation of an action for negligent representation or omission, even if the claim is based on the same facts as the original claims.  See id.  Plaintiffs' Texas action, in which the claim of fraudulent concealment and representation was first made, was not filed until November 16, 2006, which is

25

outside of the three-year statutory period from Simpson's diagnosis with any disease process whatsoever. As Porter Warner was not given notice within the applicable statute of limitations that it would need to defend against a claim of fraudulent concealment and representation, that cause of action was not preserved by the Rule 41 savings provision and should be dismissed.

## CONCLUSION

In light of the foregoing, Porter Warner respectfully requests that this Court dismiss all causes of action set forth in Plaintiffs' Complaint on the basis that Plaintiffs have failed to file their action within the applicable three-year statute of limitations, failed to file their action within the six-year statute of repose, and failed to establish that Simpson was exposed to any silica or silica-containing products distributed to his workplace by Porter Warner and, therefore, that Porter Warner caused any of Plaintiffs' alleged injuries and damages.

This the 16th day of August, 2010.

/s/ Daniel B. Eller
Daniel B. White (S.C. Bar No. 6070)
(admitted *Pro Hac Vice*)
Stephanie G. Flynn (S.C. Bar No. 16653)
(admitted *Pro Hac Vice*)
Frances G. Zacher (S.C. Bar No. 74197)
(admitted *Pro Hac Vice*)
Daniel B. Eller (NC Bar No. 31503)
GALLIVAN, WHITE & BOYD, P.A.
Post Office Box 10589
55 Beattie Place, Suite 1200
Greenville, SC 29603
(864) 271-9580
(864) 271-7502 (facsimile)

Attorneys for Defendant,
Porter Warner Industries, L.L.C.

26

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATIONS

The undersigned hereby certifies that this MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT PORTER WARNER INDUSTRIES, L.L.C.'S MOTION FOR SUMMARY JUDGMENT complies with Section 3(b)(iv) of the Initial Scheduling Order, as verified using the Word Count tool in Microsoft Word.

Dated this 16th day of August, 2010.

/s/ Daniel B. Eller
Daniel B. White (S.C. Bar No. 6070)
(admitted *Pro Hac Vice*)
Stephanie G. Flynn (S.C. Bar No. 16653)
(admitted *Pro Hac Vice*)
Frances G. Zacher (S.C. Bar No. 74197)
(admitted *Pro Hac Vice*)
Daniel B. Eller (NC Bar No. 31503)
GALLIVAN, WHITE & BOYD, P.A.
Post Office Box 10589
55 Beattie Place, Suite 1200
Greenville, SC 29603
(864) 271-9580
(864) 271-7502 (facsimile)

Attorneys for Defendant,
Porter Warner Industries, L.L.C.

27