UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| John Parks Simpson and Freda Simpson, ) | |
| ) | |
| ) | CIV. NO. 3:09-CV-172-FDW-DSC |
|        Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| Air Liquide America LP, Celite Corp., ) | |
| Mine Safety Appliances Co., Porter ) | |
| Warner Industr. LLC, ) | |
| Wesco Refractories, Inc, and John Doe 1-5 ) | |
| ) | |
|        Defendants. ) | |
| ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT PORTER WARNER'S MOTION FOR SUMMARY JUDGMENT

Comes now the Plaintiffs and hereby oppose Defendant Porter Warner's Motion for Summary Judgment. Plaintiffs request the defendants motion be denied, because Plaintiffs initial action and all other actions were brought within the North Carolina three year statute of limitations for personal injuries and the filing of any previous actions acted to toll the limitations from running against Defendant. The North Carolina Statute of Repose is not applicable to the present action because the action does not involve an "injury" but rather an occupational disease. Plaintiff has established through testimony of Plaintiff, Plaintiff's co-workers and the Defendants Interrogatory Answers that Porter Warner did sell silica products to Charlotte Pipe and Foundry during Plaintiff's employment and that Plaintiff was exposed to such. Plaintiffs submit that material questions of fact exist on issues of exposure and causation to support the denial of Summary Judgment.

1

## I. LEGAL STANDARD

Summary judgment is ordinarily inappropriate in negligence actions.

<u>In no other area of the law does the lay jury play a more definitive role than in a negligence case when it is required to determine whether an actor's conduct is prudent and reasonable under the given circumstances</u>. Along with questions of foreseeability and proximate cause, equating the actor's conduct with reasonable care often depends on factual resolution of conflicting inferences. The inferences to be drawn from the proofs turn on the degree of corroboration mixed with the overall skill of persuasion demonstrated by the respective adversaries. Such issues readily lend themselves to policy determinations based upon the general mores of the community. With this understanding, it should be readily perceived that <u>a summary proceeding which denies the parties the right of trial by jury and which attempts to decide the case on abbreviated proof should rarely be used in negligence suits</u>.

*Cook v. Baker Equipment Engineering Co., Inc.*, 582 F.2d 862, 865 (4th Cir. 1978) (emphasis added); *see also Spaulding v. Ads-Anker Data Systems Midwest, Inc*., 498 F.2d 517, 518 n. 1 (4th Cir. 1974). North Carolina law governs this case and North Carolina state courts are in accord. *Prior v. Pruett*, 143 N.C.App. 612, 550 S.E.2d 166 (2001) ("Generally, summary judgment is inappropriate in cases alleging negligence because the standard of reasonable care should ordinarily be applied by the jury under appropriate instruction from the court."); *Ragland v. Moore*, 299 N.C. 360, 363, 261 S.E.2d 666, 668 (1980) ("[I]t is only in exceptional negligence cases that summary judgment is appropriate, since the standard of reasonable care should ordinarily be applied by the jury under appropriate instructions from the court."); *Green v. Wellons, Inc*., 52 N.C.App. 529, 532, 279 S.E.2d 37, 39-40 (1981) (because of "peculiarly elusive nature of the term 'negligence', the jury generally should pass on the reasonableness of conduct in light of all the circumstances of the case").

## II. THE FILING OF THE EARLIER ACTIONS ACTED TO TOLL THE STATUTE OF LIMITATIONS

Plaintiffs do not dispute that any action related to Mr. Simpson's silicosis injuries must be brought within three years of the date of discovery of such injuries. Plaintiffs' complaint has alleged two distinct injuries, one resulting in silicosis and the second resulting in a silicosis related lung cancer. The trigger date for Plaintiff's diagnosis for the silicosis claim would be the diagnosis of silicosis. This is not disputed as being July 12, 2002. The trigger date for the silicosis related lung cancer would be the December 13, 2003 diagnosis. The South Carolina action, as Defendant properly notes, was filed on April 20, 2005, within three years from the date Mr. Simpson's silicosis and lung cancer were originally diagnosed. The Texas action was filed on November 16, 2006, within three years of the lung cancer diagnosis. If Plaintiffs can establish that the current action relates back to the filing of the South Carolina action as a result of tolling, then it is clear that all claims and both injuries within the 2009 complaint were filed within the applicable statute of limitations. If the Plaintiffs can establish that the current action relates back to the Texas filing, all claims related to the silicosis related lung cancer were filed within the limitations period.

It is black letter North Carolina law that the filing of a complaint will toll the statute of limitations. *See N.C. R. Civ. Proc*. 4. It is also recognized that North Carolina law that motions for voluntary dismissals do allow for the refiling of a new complaint within one year from the date of the voluntary dismissal. *See N.C. R. Civ. Proc*. 41. These rules apply in the current action. The filing of the Texas State Court case was filed within one year of the South Carolina dismissal via the Door Closing Statute, not a merits decision. The Texas action should relate back to the South Carolina filing.

Defendant's entire argument hinges upon the argument that the current action in the Western District of North Carolina was filed more than three years after discovery and statute

3

of limitations in North Carolina had expired. Defendant's arguments fail to recognize the long line of cases that hold the filing of a lawsuit acts to toll the statute of limitations. The Texas courts have long held that the filing of an action tolls the limitation periods for any future filings. *See generally Strayhorn v. Willowcreek Resources, Inc.,* 161 S.W.3d 716 (Tex Crt. App. 2004*;* and *Texas A&M University v. Ybarra,* 663 S.W. 2d 80 (Tex Crt. App. 1983). North Carolina courts have also recognized that the filing of an action works to toll the limitations period. *See generally Lattimore v. Powell,* 190 S.E. 2d 288 (N.C. Crt. App. 1972). Federal Courts have also recognized similar tollings. For example, in class actions the *American Pipe* doctrine indicates that the filing of a class action lawsuit would act to toll the limitation period for any putative class member who sought to file their own action prior to a decision on class certification being made. *American Pipe and Construction Co. v. Utah,* 414 U.S. 538 (1974). Therefore, because the initial West Virginia, South Carolina action, and subsequent Texas State Court action were all filed within the three years of the plaintiff's diagnosis, those filings acted to toll the statute of limitations applicable to the Plaintiffs' claim.

## III.     ALL CAUSES OF ACTION WOULD BE SUBJECT TO THE TOLLING DOCTRINE.

Defendants argument on all of Plaintiffs' causes of action (strict liability, negligence, breach of warranty, etc) is that the 2009 filing is more than three years after the discovery of the injury or accrual of the cause of action and as such all claims are barred by the statute of limitations. Plaintiffs have established above, that the filing of a prior action will toll the statute of limitations. Tolling would apply in this situation, as such the current action and all claims relate back to the original South Carolina filing in 2005. This would protect all current claims.

If this Court were to find that the South Carolina filing, because it was dismissed pursuant to the Door Closing Statute, does not act to toll the later actions, then the filing of the Texas cause of action, within three years of the date Mr. Simpson was diagnosed with lung cancer, would be timely and all claims related to Mr. Simpson's lung cancer would be considered timely filed.

### IV. IT IS WELL SETTLED LAW THAT LATENT DISEASES SUCH AS SILICOSIS ARE NOT SUBJECT TO THE PRODUCT LIABILITY STATUTE OF REPOSE.

It is well settled in North Carolina that the six year statute of repose included within N.C.G.S. §1-50 (a)(6) is not applicable to claims of occupational diseases where the disease manifests itself more than six years after the initial sale and/or consumption of the alleged defective product. *See generally Hyer v. Pittsburgh Corning Corp.*, 790 F.2d 30 (4th Cir. 1986); and *Silver v. Johnsmanville Corporation*, 789 F.2d 1078 (4th Cir. 1986). In both *Hyer* and *Silver*, the Court was faced with the Defendant's motion to dismiss claims for asbestos related diseases brought more than six years after the initial sale and/or consumption of the asbestos products at issue. In both actions, the Court determined based upon North Carolina Supreme Court precedent, that a latent disease process exception applies to the North Carolina Statute of Repose and such disease process should not be considered an "injury" in the statutory context. *Hyer*, 790 F.2d at 33-34.

The Fourth Circuit opinions are based upon the North Carolina Supreme Court's decision in *Wilder v. Amapex Corp.*, 314 N.C. 550, 336 S.E.2d 66 (N.C. 1985). In *Wilder*, the issue was whether a claim for asbestosis could be brought against a manufacturer more than ten years from the last act of the defendant giving rise to the claim for relief, i.e. the sale

of the alleged defective product. *Wilder*, 314 N.C. at 554. [1] In *Wilder*, the question became whether the statute of repose, which in essence required Plaintiff in an action related to an asbestos exposure within ten years from the last act, applied to an occupational disease; asbestos. As the Court noted, asbestosis, like silicosis, is a disease process which is commonly described as a latent process, one that takes years after exposure to ultimately develop and discover.

The *Wilder* Court focused on the issue of whether an occupational disease process could be defined and fall within the definition of "injury" for purposes of the statute's application. The Court noted the following:

> A disease presents an intrinsically different kind of claim. Diseases such as asbestosis, silicosis and chronic obstructive lung disease normally develop over long periods of time after multiple exposures to offending substances which are thought to be causative agents. It is impossible to identify any particular exposure as the "first injury". Indeed, one or even multiple exposures to an offending substance in these kinds of diseases may not constitute an injury. The first identifiable injury occurs when the disease is diagnosed as such, and at that time it is no longer latent.

*Wilder*, 314 N.C. at 557. The Court found additional support for separating disease processes from injury in the North Carolina statutory context and ultimately found:

> From the foregoing, we see that when the legislature considered occupational diseases, it is almost always equated the diseases' manifestation or its diagnosis as being the "injury" from which various time periods began to run.

*Id.* at 560. Based upon that, the Court held that in terms of occupational disease claims, the injury equates with diagnoses and that the statute of repose contained in N.C.G. §1-15(b) is not applicable to claims of diseases. *Id.* at 562. While the statute at issue in

---

[1] The statute at issue in *Wilder* was N.C.G.S. §1-15 (b) a statute of repose that was repealed in 1979, but whose operation acted identically to N.C.G.S. §1-50 (a)(6) the statute at issue.

6

*Wilder* was slightly different, the Fourth Circuit has applied the *Wilder* Court's rationale to the defective product statute of repose, as should this Court.

## V. PLAINTIFFS HAVE FORECASTED EVIDENCE TO SUBSTANTIATE EXPOSURE TO PORTER WARNER PRODUCTS.

Plaintiffs maintain that material questions of fact exist as to whether John Simpson was exposed to silica products distributed by Porter Warner and whether such exposure substantially contributed to the development of Mr. Simpson's silicosis and lung cancer. Plaintiffs maintain that there is evidence in the form of Porter Warner's Answers to Interrogatories, testimony from Charlotte Pipe and Foundry personnel, John Simpson's testimony, and the testimony of co-workers of John Simpson that substantiate Porter Warner distribution of silica and silica related products to Charlotte Pipe and Foundry during the period of Plaintiff's employment. Plaintiffs would also submit that the same testimony and evidence establishes that the Porter Warner products distributed to the Charlotte Pipe and Foundry would be products that Mr. Simpson would have regularly worked with as a molder and pipe machine operator and that working with such products created visible dust and that Mr. Simpson breathed the dust. (Attachment 1 - Randy Smith Deposition, Pgs, 112-113) Plaintiffs maintain that such evidence mandates that the Court deny Defendant's Motion for Summary Judgment on Porter Warner exposure related issues.

Mr. Simpson's work history at the Charlotte Pipe and Foundry is not in dispute. The parties acknowledge that Mr. Simpson worked at Charlotte Pipe and Foundry a limited time in 1959 as a molder, again from 1960-1963 as a molder, and then continuously from 1964 through 1998 as a molder, pipe operator, spray mixer, and

7

in the supply room. Indeed from approximately 1988/89 through 1998, Mr. Simpson worked in the supply room where Plaintiffs do not dispute there was no silica exposure during that time period. (Attachment 2 – Plaintiffs' Answers to Defendant's Interrogatories).

It is undisputed that during Mr. Simpson's employment at Charlotte Pipe and Foundry Porter Warner did provide raw ground silica (U.S. Silica), western bentonite (volclay), and other products to Charlotte Pipe and Foundry. In addition to those products, Porter Warner beginning in approximately 1996, began supplying 50% of Charlotte Pipe and Foundry's resin coated sand. (Attachment 3 - Porter Warner's Supplemental Answers to Interrogatories, see Answers 5 and 6).

The products supplied by Porter Warner to Charlotte Pipe and Foundry beginning in at least 1984 would have been used by molders and pipe machine operators. (Attachment 1 - Smith Deposition, Pgs. 112-113) Porter Warner sold volclay to Charlotte Pipe and Foundry every month beginning in 1984. (Attachment 1 - Smith Deposition, Pgs. 122, 124, and 128) The western bentonite sand and the raw ground silica were products distributed by Porter Warner that would be used in the making of "cores" which are an integral part of the foundry and pipe making process (Attachment 1 - Smith Deposition, Pg. 35). The raw ground silica and/or western bentonite would be mixed at Charlotte Pipe and Foundry to create a product commonly referred to as "core sand" that would ultimately be used at the Foundry to make cores which every pipe machine operator would use. (Attachment 4 - Simpson Deposition, Pgs. 82-87) Indeed, Mr. Simpson regularly used cores and core sand. (Attachment 5 - Charlie Ray Spring's Deposition, Pgs. 66 and 67; and Attachment 6 - Thomas

8

Deposition at Pg. 75). Additionally, Mr. Simpson testified that he would use the western bentonite and raw ground sand, products supplied by Porter Warner to Charlotte Pipe and Foundry, in his job as a pipe operator and molder in the new shop at the Foundry. (Attachment 4 - Simpson Deposition at Pgs. 202 and 203). Mr. Simpson described his exposures throughout his entire work history and also testified that he was not ever required to wear a respirator (Attachment 4 - Simpson Deposition at Pgs. 75 and 76).

Much of the Porter Warner Product identification discovery has been revealed through the testimony of Randy Smith, Vice-President at Porter Warner, the investigation into sales of materials to Charlotte Pipe and Foundry. Mr. Smith explained that Porter Warner's entry into the Charlotte Pipe and Foundry began in 1984, after Joe Whiteside Company went out of business. As Mr. Smith explained, Joe Whiteside was a supplier of silica related products to Charlotte Pipe and Foundry for several years but in 1984 went out of business. Porter Warner stepped in and purchased the Whiteside Warehouse and also began to employ Joe Whiteside as the Porter Warner sales representative responsible for North Carolina and South Carolina and who sold product to Charlotte Pipe and Foundry. (Attachment 1 - Randy Smith Deposition at Pgs. 12-14). Mr. Smith explained that Porter Warner would distribute the product of United States Silica as well as other company's products, which included western bentonite and other silica related products to Charlotte Pipe and Foundry and that such sales began in 1984. (Attachment 1 - Smith Deposition, Pgs. 108-109, 122-128)

Mr. Smith also testified that Porter Warner expanded its operation in the early or late 1990s when it opened up its Richburg Warehouse in South Carolina because

9

Porter Warner sales in the area had expended (Attachment 1 - Smith Deposition Pg. 14).  As Mr. Smith explained, during those years, Porter Warner would distribute products to Charlotte Pipe and Foundry both from Chattanooga, Tennessee (Porter Warner's main warehouse) as well as the Richburg location.  Each location would deliver different products to Charlotte Pipe and Foundry.  (Attachment 1 - Smith Deposition at Pg. 108-109)  This is significant because of the amount of sand and silica that was used on a regular basis at Charlotte Pipe and Foundry.  As Mr. Smith explained, a mill the size of Charlotte Pipe and Foundry would be considered a large mill and he has estimated used 25,000 – 30,000 tons of sand/silica a year in its operations (Attachment 1 - Smith Deposition, Pg. 44; 80).

Charlotte Pipe and Foundry's personnel testimony is consistent with that of Randy Smith.  For example, Tommy Thomas, a Charlotte Pipe and Foundry employee from 1978 with responsibilities in both the warehouse and purchasing testified that "Porter Warner was a big supplier of the Charlotte Pipe" and "there were several materials that Charlotte Pipe purchased from Porter Warner."  Thomas also noted "they were purchased from the time I got there in 1978 until I left purchasing."  (Attachment 6 - Tommy Thomas Deposition at Pg. 38).  Thomas explained "all the sands that I am familiar with the time I've been there it came from Porter Warner, Southern Precision, and Whitehead Brothers…" (Attachment 6 - Tommy Thomas Deposition at Pg. 58).  Indeed, Mr. Thomas testified that there was a Porter Warner sales representative, Joe Whiteside, who was responsible for Charlotte Pipe for over twenty-five years.  (Attachment 6 - Tommy Thomas Deposition at Pg. 76).   Thomas explained that it was the Porter Warner sales representatives that invited Mr. Thomas both to the

Chattanooga facility as well as the Richburg, South Carolina facility. (Attachment 6 - Tommy Thomas Deposition at Pgs. 77-79).

Again, there is sufficient evidence, more than a scintilla of evidence, including Mr. Simpson's own testimony that he recalled Porter Warner independently at Charlotte Pipe and Foundry and that use of the sand would create dust and that he would breathe that dust. (Attachment 4 - Simpson Deposition at Pgs. 201-204). From this foundation the jury could infer that Mr. Simpson did in fact work with and was exposed to silica products, distributed by Porter Warner to Charlotte Pipe and Foundry. As a result, the Defendant's Motion should be denied.

## V.    CONCLUSION

Plaintiffs have established the current action is timely filed; that the North Carolina Defective Products Statute of Repose (N.C.G.S. §1-50(a)(6)) does not apply to silicosis; and that questions of fact exist on Mr. Simpson's exposure to silica products distributed by Porter Warner. As such, the Defendant's Motion should be denied.

Respectfully Submitted:

s/Frederick Jekel
_____
Frederick Jekel, Esq.
**Jekel-Doolittle, LLC**
210 Wingo Way, Suite 201
P.O. Box 2579
Mt. Pleasant, SC 29465
(843) 654-7700
(888) 567-1129 (fax)
Fritz@J-DLaw.com

AND

Bill Graham, Esq.
**Wallace & Graham, P.A.**
525 North Main Street
Salisbury, N.C. 28144
(704) 633-5244
(704) 633-9434 (fax)
Bgraham@wallacegraham.com

Dated: 10/8/10

ATTORNEYS FOR THE
PLAINTIFFS